Amoia v Amoia (2023 NY Slip Op 06632)

Amoia v Amoia

2023 NY Slip Op 06632

Decided on December 22, 2023

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 22, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., LINDLEY, GREENWOOD, AND NOWAK, JJ.

852 CA 22-01984

[*1]RACHEL L. AMOIA, PLAINTIFF-RESPONDENT,
v
JONATHAN J. AMOIA, DEFENDANT-APPELLANT. 

LAW OFFICE OF JOSEPH G. MAKOWSKI, BUFFALO (JOSEPH G. MAKOWSKI OF COUNSEL), FOR DEFENDANT-APPELLANT.
JUSTIN S. WHITE, WILLIAMSVILLE, FOR PLAINTIFF-RESPONDENT.

 Appeal from an order of the Supreme Court, Erie County (Dennis E. Ward, J.), entered August 17, 2022. The order determined that the separation and settlement agreement of the parties was void and not enforceable. 
It is hereby ORDERED that the order so appealed from is unanimously affirmed without costs.
Memorandum: Plaintiff wife commenced this action seeking to set aside a separation and settlement agreement (agreement). Defendant husband appeals from an order, following a bench trial, that, inter alia, determined that the agreement was void and not enforceable, and we affirm.
The parties were married in 2007 and have three children. Unbeknownst to the wife, the husband met with an attorney in late March 2020 and had the agreement drafted after learning of the wife's extramarital affair. On the morning of April 7, 2020, the husband's mother came to the marital home and picked up the children. Shortly thereafter, the husband's brother arrived at the marital home. The husband then presented the agreement for the wife to sign while the brother recorded the meeting on a laptop computer. The resulting video shows that the husband told the wife she had two options: in sum, the plan A option was to sign the agreement as is, that day, and the plan B option was to go to "war," with the husband filing for divorce. He told her that upon signing the agreement, she had to vacate the marital home because "[she could not] afford this house," and she would be supervised while packing her possessions. For just 20 minutes, the husband went over the agreement with the wife. Although he told her that she could have an attorney review it, he added, "[i]t doesn't matter, because I am not changing anything." He represented that the agreement was "equitable and how the courts will approve it." He explained that they would have joint custody of the children, but for holidays he had "the first choice." He represented that for child support, he was giving her "more than [he was] supposed to give [her]." He told her that he would not pay her "anything specifically for the [marital home]" because of the "extra money" he was giving her for maintenance. When the wife expressed confusion and asked, "[a]limony is not required?," the husband responded, "[i]t's not required in our circumstances, no."
The video shows that the wife, upon the husband's insistence, then flipped through pages in the plan B folder that corresponded to the husband's "war" option, which contained text messages and pictures sent between the wife and her paramour. The husband represented that in a contested divorce, "you have to prove there's a fault," and that the wife was at fault because of her extramarital relationship. The husband stated that he would pursue "full custody" of the children and that a contested divorce would be more stressful for the wife and the children. He added that "everything" would become public information, including the contents of the plan B folder, i.e., the wife's affair and all its details. He told the wife that knowing all the details would "mess . . . up" the children, but "[t]hat's the risk that [she] took." He falsely claimed that the [*2]wife could go to jail as a result of her conduct with her paramour. The wife signed the agreement, stating upon the husband's prompting that she was not under duress in doing so. The husband arranged for a notary public to be present at the house and sign the agreement, and with the notary's departure the video ends.
" 'Judicial review [of separation agreements] is to be exercised circumspectly, sparingly and with a persisting view of the encouragement of parties settling their own differences in connection with the negotiation of property settlement provisions' " (Skotnicki v Skotnicki, 237 AD2d 974, 974 [4th Dept 1997]). "[A]n agreement between spouses may nevertheless be invalidated if the party challenging the agreement demonstrates that it was the product of fraud, duress, or other inequitable conduct" (Campbell v Campbell, 208 AD3d 1050, 1051 [4th Dept 2022]; see Cohen v Cohen, 170 AD3d 948, 949 [2d Dept 2019]). We conclude that the agreement was properly set aside on the grounds of both unconscionability and duress.
Addressing first the issue of unconscionability, we note that "[a] separation agreement should be set aside as unconscionable where it is 'such as no person in [their] senses and not under delusion would make on the one hand, and as no honest and fair person would accept on the other, the inequality being so strong and manifest as to shock the conscience and confound the judgment of any person of common sense' " (Tuzzolino v Tuzzolino, 156 AD3d 1402, 1403 [4th Dept 2017]; see Campbell, 208 AD3d at 1052). Here, the husband presented the agreement, prepared by his attorney, to the wife for signing. Under the agreement, the wife would receive approximately $38,000 annually in child support and $22,000 annually in spousal support with no interest in the marital residence and its furnishings, no interest in the marital share of a business and real property, and no interest in a stock account worth approximately $178,000. Although it is not a dispositive factor, Supreme Court properly considered that the wife was not represented by counsel when the agreement was signed (see Campbell, 208 AD3d at 1052). We further conclude that the court properly determined that the terms of the agreement would "shock the conscience and confound the judgment of any [person] of common sense" (Tuzzolino, 156 AD3d at 1403 [internal quotation marks omitted]; see Dawes v Dawes, 110 AD3d 1450, 1451 [4th Dept 2013]), in light of the husband's significant annual earnings and the fact that the wife was not employed.
Addressing next the issue of duress, we note that an agreement "is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of [that party's] free will" (Austin Instrument v Loral Corp., 29 NY2d 124, 130 [1971], rearg denied 29 NY2d 749 [1971]; see Campbell, 208 AD3d at 1051). The video shows that the husband did most of the talking, with the wife saying very little. The wife often appeared surprised, distraught, and emotional. The court properly concluded, on the basis of the husband's "threats of losing custody, the children learning of the [w]ife's indiscretions, [and] the publication of private, personal communications and pictures [sent by] the [w]ife to a male friend[,] together with threats of likely criminal prosecution," that his conduct deprived the wife of the exercise of her free will (cf. Campbell, 208 AD3d at 1051-1052; Shah v Mitra, 171 AD3d 971, 976-977 [2d Dept 2019]; Lyons v Lyons, 289 AD2d 902, 904 [3d Dept 2001], lv denied 98 NY2d 601 [2002]; see generally Austin Instrument, 29 NY2d at 130-131). Contrary to the husband's contention, he did not merely threaten to do what he had a legal right to do, i.e., file for divorce (see generally Campbell, 208 AD3d at 1051-1052; Shah, 171 AD3d at 976-977; Lyons, 289 AD2d at 904).
We have considered the husband's remaining contentions and conclude that none warrants reversal or modification of the order.
Entered: December 22, 2023
Ann Dillon Flynn
Clerk of the Court